# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**GENE HIRT, et al.,**

    **Plaintiffs,**

    **v.**

**UNIFIED SCHOOL DISTRICT NO. 287, et al.,**

    **Defendants.**

**CASE NO. 2:17-CV-02279-HLT**

---

## MEMORANDUM AND ORDER

Plaintiffs Gene Hirt and Eric Clark filed this case under 42 U.S.C. § 1983 alleging constitutional violations under the First, Fifth, and Fourteenth Amendments, along with state claims under the Kansas Open Meetings Act ("KOMA") and Kansas Open Records Act ("KORA").[1] The defendants in the case are the Unified School District 287 ("USD 287") and Superintendent Jerry Turner, named in his individual capacity. Doc. 49. The allegations stem from a July 13, 2015 letter to Hirt that banned him from school district property.

Both sides seek summary judgment—Plaintiffs on some claims and Defendants on all. Doc. 142; Doc. 147.[2] Factual disputes prevent summary judgment on the issue of whether the categorical ban of Hirt violated his First Amendment rights. But because the law on the First Amendment issue is not clearly established, Turner is entitled to qualified immunity on all claims

---

[1] Because Plaintiffs proceed pro se, the Court liberally construes their pleadings and holds them to a less stringent standard than formal pleadings drafted by lawyers. *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991). But the Court does not assume the role of advocate. *Id.*

[2] Although Turner and USD 287 have been sued on separate counts, they filed a joint motion and joint response to Plaintiffs' motion. The same is true for Plaintiffs. Accordingly, for simplicity, the Court generally refers throughout to arguments raised by "Plaintiffs" and "Defendants."

against him individually. Defendants are also entitled to summary judgment on Hirt's due-process claim, Clark's First Amendment claim, and on Plaintiffs' claims under both KOMA and KORA.

## I. BACKGROUND[3]

### A. School Board Meeting Exclusion

USD 287 holds school board meetings once a month to address school matters. At board meetings, members of the public are allowed three minutes to address the board during the "patron forum." Doc. 149 at 3-4; Doc. 154 at 3.

Neither Hirt nor Clark have any children or family members who attend USD 287 schools. Doc. 155 at 2-3. Defendants assert that neither Hirt nor Clark do any business with USD 287, but Plaintiffs dispute that, claiming that attending school board meetings, submitting open records requests during office hours, and attending sporting events constitute lawful business. Doc. 149 at 3; Doc. 155 at 2-3; Doc. 156 at 1.

From February 2015 through June 2015, witnesses observed Hirt driving through school parking lots during school hours at least sixteen times, though no one from the school ever advised him that doing so was a violation of any school district policy. Doc. 154 at 3; Doc. 149 at 3; Doc. 155 at 12. On March 25, 2015, school staff told Turner that Hirt had come to a school during school hours with a photographer to take pictures. When staff denied him entry, they reported he became angry. Doc. 154 at 3; Doc. 156 at 1-2. On April 2, 2015, school staff told Turner that Hirt again tried to enter a school building during school hours but was denied access. School staff

---

[3] For purposes of summary judgment, the Court has set forth only those uncontroverted facts required to reach its decision. The parties contest several facts, which are only noted to the extent they are material to the Court's decision.

reported that Hirt made them afraid for their safety. Doc. 149 at 3; Doc. 155 at 3; Doc. 154 at 3; Doc. 156 at 2.[4]

Following the June 8, 2015 school board meeting, Hirt called Turner a "dork." Doc. 149 at 4; Doc. 155 at 4. Hirt also called board members names while in the audience at school board meetings, including calling board members "sons of bitches." Doc. 149 at 4. Hirt also spoke up outside the context of the patron forum without permission and was reprimanded by the school board president. Doc. 149 at 4. But USD 287 never restricted or reprimanded Hirt for any of his comments during the patron forum. Doc. 154 at 3; Doc. 149 at 5.

Until July 2015, Hirt was never asked to leave any school premises or any of the school board meetings he attended (approximately 40 meetings between 2012 and 2015). Doc. 155 at 9-10. Hirt also observed numerous people at numerous school board meetings talking outside of the patron forum, including commenting and mumbling, without being reprimanded. Doc. 155 at 10.

But on July 13, 2015, Turner, after consultation with school district attorneys, and pursuant to his authority under district policies KGDA and KGD, sent a letter to Hirt stating that he was no longer allowed on USD 287 property. Doc. 143 at 1-2; Doc. 154 at 2; Doc. 149 at 2, 4.[5] Those policies give the superintendent authority to deny access to people with no lawful business with a school or those who are disruptive or disturbing towards normal educational functions. Doc. 154 at 3; Doc. 149 at 4-5.

On June 14, 2017—after this case was filed—Defendants notified Hirt that he was no longer excluded from entering USD 287 property to attend board meetings or public events. Doc.

---

[4]   Hirt attempts to controvert some of these facts on hearsay grounds. But to the extent the facts are provided to show what Turner was told, those facts are not offered for the truth of the matter asserted. *See* Fed. R. Evid. 801(c).

[5]   Plaintiffs call this letter an "exclusion order." Doc. 143 at 1. Defendants dispute that it was an "exclusion order" but concede that it did prohibit Hirt from entering USD 287 property. Doc. 154 at 2. For ease of reference, the Court will refer to this letter as the "July 13 exclusion letter."

154 at 6.[6] The parties dispute why Defendants banned Hirt from school property. Defendants claim it was because of Hirt's increasingly rude and disruptive behavior and comments at school board meetings, his numerous unauthorized trips onto school property that made school staff uncomfortable, and his "threatening" behavior towards Turner following the June 8, 2015 school board meeting. Doc. 154 at 3; Doc. 149 at 4. Hirt contends that those reasons are a "ruse" and that it was because he called board members "SOBs." Doc. 155 at 4-6; Doc. 156 at 2-4. Between July 13, 2015 (the date of the exclusion letter), and June 14, 2017 (when Hirt's exclusion was lifted), there were approximately twenty-four USD 287 school board meetings. Doc. 143 at 1. Hirt would have attended all USD 287 sporting events during that time, but for the July 13 exclusion letter. Doc. 155 at 9. Additionally, on August 19, 2015, Hirt and Clark attended an Open House event at Williamsburg Elementary School. A sheriff's deputy asked Hirt to leave, which he did.[7] Doc. 155 at 9; Doc. 159 at 2.

Clark attended and spoke at school board meetings on April 13, 2015, May 11, 2015, and August 12, 2015. Doc. 149 at 7; Doc. 155 at 11; Doc.159 at 3. Specifically, Clark spoke during the patron forum at the August 12, 2015 meeting and used the terms "ninnies" and "nincompoops," though the parties dispute whether Clark was referring to school officials or whether he was just speaking in hypothetical terms. Doc. 149 at 7; Doc. 155 at 8. Regardless, Clark has never been specifically excluded from any school district property or had any action taken against him by

---

[6]  Hirt was also permitted to enter school property to attend his 50th high-school reunion. Doc. 155 at 9-10.

[7]  Plaintiffs claim Hirt was asked to leave "under threat of immediate criminal sanctions," citing a declaration by Clark. Doc. 155 at 9 (citing Doc. 114-13 at ¶ 5). Defendants dispute this, citing Hirt's own deposition testimony that he was at the Open House event when a sheriff's deputy asked him to leave because Turner did not want Hirt on school property. Hirt asked if he could eat a hotdog first, and the deputy allowed him to do so. He was asked to leave again after he finished eating, and he agreed to go. Doc. 159 at 2 (citing Doc. 117-5 at 11-12 (deposition pages 112 and 113)).

USD 287. Doc. 149 at 7. Clark claims he has self-censored himself since Hirt was excluded out of fear that the same action would be taken against him. Doc. 155 at 11.

### B.    Kansas Open Records Act Requests

Hirt sent a letter to Turner, who is custodian of records for USD 287, on July 21, 2015. The letter was in response to the July 13 exclusion letter, but the parties dispute whether the July 21 letter was also a KORA request requiring a response. Doc. 143 at 1; Doc. 154 at 2, 4; Doc. 156 at 4-5; Doc. 149 at 5; Doc. 155 at 6-7. Specifically, the July 21 letter from Hirt largely addresses the July 13 exclusion letter and asks for clarifications about it. In addition to asking Turner to clarify and define certain words used in the July 13 exclusion letter and to cite to the evidence relied on to exclude Hirt, Hirt also asked Turner to "please provide the policy and/or procedure which was used for determining sanctions or penalties and when they are to be applied by the district." Doc. 149-17 at 3. The parties dispute whether this language constitutes a KORA request. Doc. 154 at 4; Doc. 156 at 4.

Clark separately sent two open records requests that are relevant to this case. He sent the first on July 21, 2015, and it requested records "indicating any type of disciplinary action concerning Gene Hirt," and "containing any reference to Gene Hirt in official memoranda of the District Superintendent." Doc. 154 at 4. Defendants denied the request, citing a KORA exemption. Doc. 154 at 4; Doc. 149 at 6. Clark disputed the exemption and filed a lawsuit in Franklin County District Court, which upheld the claimed exemption as to the July 13 exclusion letter to Hirt. Doc. 154 at 4; Doc. 149 at 6. The Kansas Court of Appeals later reversed that decision and ruled that the July 13 exclusion letter to Hirt should be disclosed under KORA. Doc. 154 at 5; Doc. 149 at

6. USD 287 then provided a copy of the July 13 exclusion letter to Clark in November 2018. Doc. 154 at 5; Doc. 149 at 7.[8]

On March 24, 2017, Clark made another KORA request for "any correspondence," "any communication," or any record constituting a "notice of any action, policy or determination relating to any regulatory, supervisory or enforcement responsibility of USD 287." Doc. 154 at 5; Doc. 143 at 1; Doc. 149 at 7. Turner and Clark wrote back-and-forth attempting to clarify Clark's request. Doc. 154 at 5; Doc. 149 at 7-8. Turner eventually informed Clark that there were no other responsive documents, other than the July 13 exclusion letter to Hirt—which, at that time, had been ruled exempt under KORA by the Franklin County District Court. Doc. 154 at 4-6; Doc. 149 at 8.[9] Clark acknowledged this, stating that the "obligation concerning my request has been discharged *except* concerning that one letter . . . ." Doc. 154 at 6; Doc. 149 at 8 (emphasis in original).

Both parties now move for summary judgment on some or all claims. Doc. 142; Doc. 147.[10]

## II.    STANDARD

Summary judgment is appropriate if "the record, including depositions, documents, . . . affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" establishes that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The moving party bears the initial burden of establishing the absence of a

---

[8]   Clark had earlier become aware of the exclusion letter when he read about it in the Ottawa Herald. Doc. 155 at 11. The letter was also attached to the complaint filed in this case on May 16, 2017. Doc. 1-1.

[9]   The Franklin County District Court's journal entry regarding the disclosure of the July 13 exclusion letter to Hirt was entered on February 7, 2017. Doc. 149-13. The Kansas Court of Appeals decision reversing that court was not issued until March 9, 2018. *See Clark v. Unified Sch. Dist. No. 287*, 416 P.3d 1032 (Kan. Ct. App. 2018).

[10]   Plaintiffs previously moved for partial summary judgment, which was denied. Doc. 112; Doc. 139.

genuine issue of fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the nonmovant to demonstrate that genuine issues remain for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986). To carry this burden, the nonmovant "may not rely merely on . . . its own pleadings." *Nahno-Lopez v. Houser*, 625 F.3d 1279, 1283 (10th Cir. 2010) (internal quotations and citations omitted). "Rather, it must come forward with facts supported by competent evidence." *Id*. The inquiry turns on "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Liberty Lobby*, 477 U.S. at 251-52. In applying this standard, courts must view the evidence and all reasonable inferences from it in the light most favorable to the nonmovant. *Matsushita*, 475 U.S. at 587.

## III.  ANALYSIS

As a preliminary matter, the Court notes that the parties have famed the issues in their dueling summary-judgment motions in a way that fails to clearly track the Third Amended Complaint or the Pretrial Order. This has made resolution of these motions <u>considerably</u> more difficult than it needed to be.

Plaintiffs seek partial summary judgment on five claims:

1. A statutory violation of KOMA as to Hirt (Count III).
2. A statutory violation of KORA as to Hirt (Count IV).
3. A statutory violation of KORA as to Clark (Count VII).
4. A challenge to the constitutionality of USD 287 policy KGDA (Count I).
5. Retaliation for protected speech as to Hirt (Count I).

Doc. 143 at 3.

Defendants move for summary judgment on all of Plaintiffs' claims. Doc. 147. The arguments in Defendants' motion are:

1. The private letter to Hirt did not create a policy.
2. Defendants did not violate Hirt's First Amendment rights.
3. Hirt was not subjected to retaliation for exercise of First Amendment rights.

7

4. The July 13 letter was not an unjustified prior restraint on Hirt's speech.
5. Clark lacks standing to assert a personal claim of a First Amendment violation.
6. Hirt does not have a substantive due process claim.
7. Hirt was not entitled to procedural due process.
8. Superintendent Turner is entitled to qualified immunity.
9. Hirt does not have a statutory right to attend open meetings.
10. Hirt's July 21, 2015, letter was not a request for a public record.
11. Clark's KORA claim is barred by res judicata and collateral estoppel.

Doc. 149 at 1-2.

The Third Amended Complaint contains eleven counts, most of which are alternative theories based on apparently known versus "unknown" school district policies. Doc. 93 at 23-26. Ultimately, the Third Amended Complaint contains counts for First Amendment violations as to both Hirt and Clark (Counts I, V, IX, and XI), a due-process violation as to Hirt (Counts II and X), KOMA and KORA claims for both Hirt and Clark (Counts III, IV, VI, and VII), and an Equal Protection violation as to Hirt (Count VIII).

But the Pretrial Order reflects a more narrowed set of claims: that the July 13 exclusion letter "is unconstitutional facially and as-applied, concerning due process, right of free speech, right to receive information, and right to assemble;" that it chilled both Plaintiffs' First Amendment rights; that it violated Hirt's statutory right to attend open meetings; that Turner, as custodian of records, violated both Plaintiffs' statutory right to obtain open records; and that Turner retaliated against Hirt based on his protected speech. Doc. 138 at 9.

Count VIII (Equal Protection) and Count VI (Clark's KOMA claim) were omitted from the Pretrial Order. Accordingly, those claims are waived and no longer part of this case. *Koch v. Koch Indus., Inc.*, 179 F.R.D. 591, 596 (D. Kan. 1998). The remaining claims are addressed below.

**A.** **Defendants did not violate KOMA by excluding Hirt from school board meetings (Count III).**

Hirt asserts that he was denied a statutory right under KOMA, K.S.A. §§ 75-4317, *et seq.*, when he was barred from school property, and he requests declaratory and injunctive relief. Doc. 143 at 5-6.[11] KOMA states that "meetings for the conduct of governmental affairs" are to be open to the public. K.S.A. § 75-4317(a). KOMA does not guarantee attendance for every individual. *See* K.S.A. § 75-4318(g)(4) (providing exceptions to the open meetings law, including "if otherwise provided by state or federal law"). In determining whether KOMA has been violated, the Kansas Court of Appeals has instructed courts to "overlook mere technical violations where the public body has made a good faith effort to comply and is in substantial compliance with the KOMA, and where no one is prejudiced or the public right to know has not been effectively denied." *Stevens v. Bd. of Cty. Comm'rs*, 710 P.2d 698, 701 (Kan. Ct. App. 1985).

Hirt claims that Defendants violated KOMA by excluding him because he is a member of the public. Defendants contend that KOMA only mandates that meetings be open to the public, which they were, but that it does not require that any individual be allowed to attend. Doc. 149 at 32-33; Doc. 154 at 7-8. Alternatively, Defendants argue that any claim that did exist under KOMA is now moot, because the July 13 exclusion letter was rescinded. Doc. 154 at 8-9. Hirt counters that the claim is not moot to the extent the Court may retroactively declare that his exclusion was wrongful, or for purposes of injunctive relief (the form of which Hirt does not explain). The Court agrees with Defendants on both points.

---

[11] As noted above, Plaintiffs did not include a KOMA claim as to Clark in Pretrial Order, so it is therefore waived and no longer part of this case. *See* Doc. 138 at 9 ("That enforcement action and [sic] also violated plaintiff Hirt's statutory right to attend open meetings." (emphasis added)); *see also Koch*, 179 F.R.D. at 596. Even if Plaintiffs did continue to assert a KOMA claim as to Clark, it would be subject to dismissal for at least the same reason Hirt's KOMA claim is subject to dismissal, to say nothing of the fact that Clark was never even prohibited from attending school board meetings and would therefore not even have suffered any loss of the so-called "statutory right" Hirt is claiming.

The undisputed facts establish that Defendants substantially complied with KOMA. KOMA provides only that meetings should be open to the public, and there are no facts presented that the school board meetings were not open to the public—only that Hirt was temporarily prohibited from coming on school property. As noted above, KOMA does not guarantee attendance for every individual. Hirt's argument that the school board meetings were not open to the public because he could not attend is the type of hyper-technical reading of KOMA disfavored by courts. Accordingly, Defendants are entitled to summary judgment on Hirt's KOMA claim.

To the extent Hirt argues he was prejudiced by exclusion, the Court agrees with Defendants that any such claim is moot. A mootness analysis can take two paths: constitutional and prudential. *Jordan v. Sosa*, 654 F.3d 1012, 1023 (10th Cir. 2011). Constitutional mootness asks whether there is still an actual controversy amenable to relief. *Id.* at 1024. By contrast, the prudential mootness doctrine may "counsel the court to stay its hand" where the controversy has become so attenuated that the court ought not act. *Id.* (quoting *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 601 F.3d 1096, 1121 (10th Cir. 2010)). In such a case, the plaintiff must make a heightened showing of substantial and irreparable injury; past exposure or speculative future harm is not enough. *Id.* As for declaratory relief, "a plaintiff must be seeking more than a retrospective opinion that he was wrongly harmed by the defendant." *Id.* at 1025. It is undisputed that, as of July 14, 2017, Hirt is no longer being excluded from school board meetings. *See* Doc. 154 at 6; Doc. 156 at 5. Here, all Hirt seeks is "acknowledgement" of a past KOMA violation.[12] Doc. 156 at 9. This

---

[12] Hirt does not seek damages on his KOMA claim, nor could he. KOMA allows for penalties only in suits brought by the attorney general or county or district attorneys. Private litigants are limited to injunctive or mandamus relief. *Stoldt v. City of Toronto*, 678 P.2d 153, 159 (Kan. 1984); *see also Clark*, 416 P.3d at 1041 (noting that the Kansas Supreme Court "expressly agreed . . . that an individual plaintiff does not have a cause of action for damages against a public agency under [KOMA]").

would not affect the behavior of the parties going forward. *See Jordan*, 654 F.3d at 1025. Accordingly, even if Defendants had violated KOMA, prudential mootness would apply.

**B.    Defendants are entitled to summary judgment on Plaintiffs' KORA claims (Counts IV and VII).**

Under KORA, all public records in Kansas are to be made available for inspection within three business days for any person who makes a request under K.S.A. § 45-220. *See generally* K.S.A. § 45-218. But the act excludes certain records. K.S.A. § 45-221(a).

At different times, both Hirt and Clark have submitted what they characterize as KORA requests. Both parties now move for summary judgment on both Plaintiffs' KORA claims. Doc. 143 at 7-9; Doc. 149 at 33-36. Because Hirt and Clark have each asserted a factually distinct KORA claim, each is discussed in turn.

### 1.    Hirt's July 21 letter was not a KORA request.

Hirt sent a letter to Turner, who is custodian of records for USD 287, on July 21, 2015. The letter was not labeled as a KORA request. Doc. 156 at 9. Defendants argue the July 21 letter was merely seeking clarification of the July 13 exclusion letter. Doc. 154 at 9; Doc. 149 at 33-34. Hirt does not dispute that it was sent to seek clarification, but he argues that does not foreclose the letter also being a request for open records, because it asked Turner to "please provide the policy and/or procedure which was used for determining sanctions or penalties and when they are to be applied by the district." Doc. 143 at 7; Doc. 149-17 at 3.

KORA's purpose is "that public records shall be open for inspection by any person unless otherwise provided," and it is liberally construed. K.S.A. § 45-216(a). KORA requires that requests be made in writing, but not in any particular form. K.S.A. § 45-220(b). KORA further provides that "a public agency shall not require that a request contain more information than the requester's name and address and the information necessary to ascertain the records . . . . No request shall be

returned, delayed or denied because of any technicality unless it is impossible to determine the records to which the requester desires access." *Id.* Kansas courts have counseled that KORA, like KOMA, should be applied with an eye to the spirit of the law, and not based on a hyper-technical reading. *See Clark*, 416 P.3d at 1043.

Based on the undisputed facts, there is no genuine issue about whether Hirt's July 21 letter constituted a KORA request: it did not. Hirt acknowledges the letter was seeking clarification of the July 13 exclusion letter, and the first paragraph of the July 21 letter itself makes that clear, as it purports to "clear up the vagueness of that notice." Doc. 149-17 at 2. The bulk of the letter is nothing more than questions posed to Turner about the scope of and reasons behind the July 13 exclusion letter. *Id.* at 2-4. The portion that Hirt contends is a KORA request is on the second page and is in no way differentiated from any of the other demands of the letter, which not even Hirt claims are KORA requests. *See* Doc. 149-17 at 3. A stray sentence buried in a letter sent for a separate purpose is not enough to turn otherwise routine correspondence into a KORA request. *See Wain v. Lexington-Fayette Urban Cty. Gov't*, 2016 WL 1403325, at *3-4 (Ky. Ct. App. Apr. 8, 2016) (finding that a letter containing multiple demands for information not covered by the open records act was beyond the scope of the state open records act).[13] Finding otherwise impose a hyper-technical reading of KORA that Kansas courts have counseled against. *See Clark*, 416 P.3d at 1043. So, although KORA does not "require a request to be made in any particular form," K.S.A. § 45-220(b), state agencies should at least be given fair notice that a letter is a request for public records, as opposed to routine correspondence. The Court therefore grants summary judgment to Defendants on grounds that Hirt's July 21 letter was not a valid KORA request.

---

[13] *Wain* involved the Kentucky Open Records Act, which requires requests be in writing, but—like the Kansas law— "it does not impose upon a requesting party any particularity or specificity requirement." *Wain*, 2016 WL 1403325, at *3; *see also* K.S.A. § 45-220(b).

## 2.      Clark's March 24 KORA request has been satisfied.

Clark's KORA claim centers on his March 24, 2017 KORA request. It is undisputed that Defendants informed Clark—and Clark acknowledged—that there were no other responsive documents to that request other than the July 13 exclusion letter to Hirt. At the time, the Franklin County District Court had ruled that the July 13 exclusion letter was exempt from disclosure under KORA, and that court ruling was on appeal. *See* Doc. 154 at 4, 6; Doc. 156 at 5. Once the Kansas Court of Appeals reversed the district court, Defendants timely provided Clark with a copy of the July 13 exclusion letter.[14] That should have finally resolved this issue.

But it did not.[15] Plaintiffs continue to argue that the July 13 exclusion letter was wrongfully withheld as exempt in response to Clark's March 24 request, which they claim is a separate issue from whether it was wrongfully withheld in relation to Clark's July 21 request. Doc. 143 at 8-9. But that is a distinction without a difference. The July 13 exclusion letter was the only pending issue from the March 24 KORA request. Defendants continued to withhold it in accordance with the governing court decision at that time. Once the Kansas Court of Appeals ruled otherwise, Defendants produced the July 13 exclusion letter to Clark in November 2018. This satisfies Defendants' obligation under KORA as to both KORA requests by Clark.

---

[14]   The Kansas Supreme Court denied review of the Kansas Court of Appeals opinion on October 30, 2018, and the letter was given to Clark in November 2018. Doc. 149 at 6-7.

[15]   Plaintiffs should be mindful of the fact that, just as KORA allows for fees and costs to be assessed against public agencies that act in bad faith, K.S.A. § 45-222(d), the same is true for plaintiffs who likewise "maintain[ an] action not in good faith and without a reasonable basis in fact or law." K.S.A. § 45-222(e). When the Plaintiffs filed this action, the applicability of the claimed KORA exemption had not yet been finally resolved by the Kansas Court of Appeals. But the issue <u>had</u> been finally decided, and the letter provided, when the Plaintiffs filed their current partial motion for summary judgment in December 2018 alleging wrongful withholding of the July 13 exclusion letter. The fact that there were separate KORA requests is irrelevant, as both Clark and Defendants had acknowledged that the July 13 exclusion letter was the only outstanding issue from the March 24 request. Even after it had been provided, Plaintiffs continued to litigate this issue. Plaintiffs are cautioned that repeated actions regarding the same document—a document that the Plaintiffs have had since 2015—will not be looked on favorably in a good-faith analysis.

Further, the propriety of the claimed KORA exemption has already been decided by the Kansas Court of Appeals, and there is no need for this Court to revisit that issue. Nor would doing so be appropriate under principles of either claim or issue preclusion. *See Kester v. Shawnee Mission Unified Sch. Dist. No. 512*, 252 F. Supp. 2d 1180, 1185-86 (D. Kan. 2003) (explaining that "[c]laim preclusion prevents parties from relitigating a cause of action that has been finally adjudicated" and "[i]ssue preclusion prevents relitigation in a different claim of issues conclusively determined in a prior action" (quoting *Jackson Trak Group ex rel. Jackson Jordan, Inc. v. Mid States Port Authority*, 751 P.2d 122, 128 (Kan. 1988))). "For claim preclusion to bar a claim, four elements must exist: '(1) same claim; (2) same parties; (3) claims were or could have been raised; and (4) a final judgment on the merits.'" *Id.* at 1185 (quoting *Winston v. State Dep't of Soc. & Rehab. Servs.*, 49 P.3d 1274, 1285 (Kan. 2002)). Issue preclusion has three elements: "(1) a prior judgment on the merits which determined the rights and liabilities of the parties on the issue based upon ultimate facts as disclosed by the pleadings and judgment, (2) the parties must be the same or in privity, and (3) the issue litigated must have been determined and necessary to support the judgment." *Id.* at 1186 (quoting *Jackson Trak*, 751 P.2d at 128).

Both standards are met here because Clark and USD 287 have already (extensively) litigated whether the July 13 exclusion letter was properly withheld under KORA. *See Clark*, 416 P.3d at 1039-40. That the other litigation was <u>technically</u> focused on the July 21 KORA request does not matter, since the only issue with either request was whether the July 13 exclusion letter was exempt. This is because KORA cases turn on whether the spirit of the law was satisfied, as opposed to technical violations. *See id.* at 1043. Here, again, Defendants have plainly satisfied their obligation under KORA as to Clark's March 24 KORA request, and they are entitled to summary judgment on this claim.

**C.** **Defendants do not dispute that the July 13 exclusion letter was issued under USD 287 authority, and thus the issue of whether it constitutes an "ad hoc policy" is irrelevant.**

Defendants argue in their motion that the July 13 exclusion letter was not an "ad hoc policy" and did not violate Hirt's First Amendment rights. Doc. 149 at 9-10. Plaintiffs argue that the letter did create a policy[16] because it was adopted by the board as a particular course of action, and that the board approved issuance of the July 13 exclusion letter, giving it the force of policy. Doc. 155 at 13-14 (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)). But given that Defendants have acknowledged that the letter was sent by Turner, who was authorized by USD 287 to act, and that USD 287 ratified Turner's actions, *see* Doc. 149 at 10, Doc. 159 at 4, this semantic dispute over whether the July 13 exclusion letter's language is or is not an "ad hoc policy" is irrelevant.

The cases and language cited by Plaintiffs in arguing that the letter created a policy focus on whether a particular <u>action</u> taken was pursuant to an official municipal policy. Doc. 155 at 13. Whether an action was taken pursuant to a municipal policy is important because the municipality itself (here, USD 287) can only be liable for the actions of its employees if the controversial <u>action</u> was taken pursuant to a municipality's "official policy." *Pembaur*, 475 U.S. at 479 (citing *Monell v. . Dep't of Soc. Servs.*, 436 U.S. 658 (1978)). This is because a municipality cannot be held liable simply under a theory of respondeat superior. *Id.* at 478; *Monell*, 436 U.S. at 694. *Pembaur* merely clarified that a single decision or action may reflect municipal policy in the context of determining whether the municipality itself can be held liable. *Pembaur*, 475 U.S. at 480-81.

---

[16] Plaintiffs have advanced an argument throughout this case that the July 13 exclusion letter created a policy (the so-called "ad hoc policy") that requires individuals to behave in a "socially acceptable manner," which was the reason given for banning Hirt. *See* Doc. 93-1 ("Your inability to express yourself in a civil and socially acceptable manner has brought about this action by the Board of Education of USD 287.").

But whether the July 13 exclusion letter was issued under USD 287's authority is not in dispute here. Defendants concede that point and acknowledge that, to the extent the letter is a constitutional violation—a separate analysis—USD 287 would be liable.[17] Given this, the question of whether the letter created an "ad hoc policy" is irrelevant.

### D. Hirt has not established any protected interest that would implicate a procedural due-process claim (Counts II and X).

Defendants move for summary judgment on Hirt's due-process claims. As a preliminary matter, Defendants challenge whether Hirt has even properly asserted a due-process claim. Doc. 149 at 25. Although the Third Amended Complaint ostensibly included two due-process violations based on, respectively, a known and unknown district policy, Doc. 93 at 23, 26,[18] the Pretrial Order only cursorily mentions due process, stating that the July 13 exclusion letter is "unconstitutional facially and as-applied, concerning due process . . . ." Doc. 138 at 9. Plaintiffs concede that Hirt only asserts a <u>procedural</u> due-process claim, not a <u>substantive</u> due-process claim. Doc. 155 at 37. But the nature of that claim is still far from clear.

It appears Plaintiffs' arguments center on the contention that Hirt has a protected liberty interest in attending school board meetings and school sporting events. But as the Court has previously noted, any due-process claims based on First Amendment violations are subsumed into the First Amendment analysis. Doc. 139 at 14 (citing *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998)). By contrast, procedural due-process claims are evaluated under a two-step process: first, determine whether there is a protected liberty or property interest that implicates due-process protections; and second, evaluate whether the procedures used to deprive the plaintiff of that

---

[17]   To be sure, Defendants vigorously dispute that there was any constitutional violation that USD 287 should be liable for at all. But that is based on a substantive defense of the constitutional claims, not *Monell*.

[18]   Those claims are only asserted on behalf of Hirt. Clark asserts no due-process claims in this case.

interest were constitutionally sufficient. *Moore v. Bd. of Cty. Comm'rs*, 507 F.3d 1257, 1259 (10th Cir. 2007). Defendants argue that Hirt has no due-process right implicated here because he has no protected interest in attending school sporting events, entering onto school property, or attending school board meetings under KOMA. Doc. 149 at 25-28. The Court agrees.

Several federal courts have concluded that there is no protected interest in entering school property. *See McCook v. Spriner Sch. Dist.*, 44 F. App'x 896, 910 (10th Cir. 2002) (noting plaintiffs "presented no authority establishing a constitutional right to go onto school property"); *Cole v. Montague Bd. of Educ.*, 145 F. App'x 760, 762 (3d Cir. 2005) ("As to the claim that the School Board violated the Coles' due process rights by 'illegally' banning them from school property, this contention plainly lacks merit."); *Lovern v. Edwards*, 190 F.3d 648, 655-56 (4th Cir. 1999) (claim "that school administrators must provide [plaintiff] with boundless access to school property are 'obviously without merit'" (citation omitted)); *Silano v. Sag Harbor Union Free Sch. Dist. Bd. of Educ.*, 42 F.3d 719, 724 (2d Cir. 1994) ("The Superintendent's order forbidding Silano from entering the school grounds also fails to implicate a protected liberty or property interest."); *Henley v. Octorara Area Sch. Dist.*, 701 F. Supp. 545, 551 (E.D. Pa. 1988) ("The right to come onto the school property was not such a right as to require any sort of a due process hearing before making the classification that excluded Mr. Henley."); *Warkevicz v. Berwick Area Sch. Dist.*, 2016 WL 3753108, at *4 (M.D. Pa. July 14, 2016) ("However, established law in this and other circuits is exactly to the contrary: to ensure the safety and wellbeing of a school district's constituents, removal or exclusion of a member of the public from school district property without a hearing does not violate a constitutional right and consequently is not so actionable."); *cf. Cyr v. Addison Rutland Supervisory Union*, 60 F. Supp. 3d 536, 546 (D. Vt. 2014) ("[T]here is no First Amendment right of access to a school board meeting."). Further, as the Court has already held,

there is no statutory right of any particular individual to attend a school board meeting under KOMA. *See* supra section III.A.

Plaintiffs cite two cases to support the claim that the ban affected a protected due-process interest. Doc. 155 at 39. The Court finds both cases distinguishable. Both cases involved access to public university facilities. *Dunkel v. Elkins*, 325 F. Supp. 1235, 1243-46 (D. Md. 1971); *Watson v. Bd. of Regents*, 512 P.2d 1162, 1164-65 (Colo. 1973). And Defendants correctly note that the Seventh Circuit has criticized *Dunkel* as being irrelevant in a non-university setting, noting that "safety and administrative concerns are heightened in the context of grade schools, and there is no indication that *Dunkel* would have extended its right of access from universities to grade schools." *Hannemann v. S. Door Cty. Sch. Dist.*, 673 F.3d 746, 755-56 (7th Cir. 2012) (citing *Lovern* and *Henley* and noting that "other circuits have similarly held that members of the public do not possess a constitutionally protected right to access school grounds").

The Court acknowledges that constitutional questions may be implicated by the July 13 exclusion letter to Hirt. But that claim is analyzed in the context of a First Amendment claim, not under due process, especially where, as here, Hirt's stated due-process claim is perfunctory and undefined. Further, the ban has since been lifted, so whatever "process" Hirt claims he is entitled to is now moot. Accordingly, Defendants are granted summary judgment as to Hirt's due-process claims.

### E. Clark has not stated a viable First Amendment claim (Counts V and XI).

Defendants argue that Clark lacks standing to pursue a First Amendment claim because he has not suffered an injury in fact, and his claim that he was "chilled" due to the action taken against Hirt is neither objectively reasonable nor subjectively true. Doc. 149 at 22-25. It is undisputed that Defendants have never taken any action against Clark or excluded him from school district

property. Doc. 149 at 7; Doc. 155 at 8. Clark also attended and spoke at a school board meeting <u>after</u> Defendants issued the July 13 exclusion letter (and after it was partially published in the local newspaper), where he referred to school officials—at least hypothetically—as "nincompoops" and "ninnies." Doc. 149 at 7. Defendants took no action against Clark as a result. Nevertheless, Plaintiffs contend Clark has "self censored his speech . . . fearing the same or similar facially unconstitutional action being taken against him . . . ." Doc. 155 at 11.[19]

Under Article III of the Constitution, there must be a case or controversy before federal courts have jurisdiction. *Ward v. Utah*, 321 F.3d 1263, 1266 (10th Cir. 2003). "To meet this standing requirement, a plaintiff must demonstrate 'that (1) he or she has suffered an injury in fact; (2) there is a causal connection between the injury and the conduct complained of; and (3) it is likely that the injury will be redressed by a favorable decision.'" *Id*. (quoting *Phelps v. Hamilton*, 122 F.3d 1309, 1326 (10th Cir.1997)). To show an injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Initiative & Referendum Inst. v. Walker*, 450 F.3d 1082, 1087 (10th Cir. 2006) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). In the First Amendment context, a plaintiff may demonstrate an injury by showing that a statute or other action had a chilling effect on his speech. *Ward*, 321 F.3d at 1267. But subjective chilling is not enough. *Id.* Rather, the "chilling effect on the exercise of a plaintiff's First Amendment rights may amount to a judicially cognizable injury in fact, as long as it 'arise[s] from an objectively justified fear of real consequences.'" *Initiative & Referendum Inst.*, 450 F.3d at 1088 (quoting *D.L.S. v. Utah*, 374 F.3d 971, 975 (10th Cir. 2004)).

---

[19] Plaintiff also states "[a]s *arguendo* only" that Clark has standing to bring an overbreadth challenge, though to what is not clear. Doc. 155 at 36. Regardless, this is insufficient to establish standing as to Clark's First Amendment claim.

Here, Clark has not demonstrated that the July 13 exclusion letter to Hirt caused an "objectively justified fear of real consequences" as to him. The only support for Clark's claim is his own statements that he self-censored and feared the same action would be taken against him. Doc. 155 at 36. "However, mere allegations of a subjective chill are 'not an adequate substitute for a claim of specific present objective harm or a threat of specific future harm.'" *D.L.S.*, 374 F.3d at 975 (quoting *Laird v. Tatum*, 408 U.S. 1, 13-14 (1972)). Further, Clark's own actions belie that he even had a subjective fear of harm, as he <u>did</u> attend a school board meeting after Hirt was excluded, and he <u>did</u> speak, to no consequence. Doc. 149 at 7.[20] Accordingly, Clark has not shown an injury that would justify standing for a First Amendment claim, and this Court therefore lacks jurisdiction because there is not valid case or controversy. Clark's claims are therefore dismissed without prejudice.

## F.     Hirt's First Amendment claims are dismissed in part.

### 1.     The Court rejects the vagueness challenge to USD 287's policies.

Plaintiffs argue that summary judgment should be granted because USD 287 policy KGDA is unconstitutionally vague. Doc. 143 at 10-17. KGDA is a USD 287 policy that authorizes the superintendent to "deny access to the school buildings, facilities, and/or grounds of the district to persons who have no lawful business to pursue at the school, persons who are acting in a manner disruptive or disturbing to the normal educational functions of the school, or persons who are on school property in violation of Board and/or building policy." Doc. 149-27 at 3. KGDA states that anyone who refuses to leave school district buildings, facilities, or grounds after being asked to do

---

[20]   The Court notes that Clark has filed at least one other case in this district claiming that the action taken towards another unconstitutionally chilled his own behavior. *Clark v. City of Shawnee*, 228 F. Supp. 3d 1210, 1219-20 (D. Kan. 2017). In that case, the court dismissed Clark's claim for lack of standing, finding that his "alleged injuries are merely conjectural and hypothetical and will not satisfy the injury-in-fact requirement." *Id.*

so by a school district employee will be considered to be trespassing, in which case police will be called and criminal charges "may result." *Id*. Plaintiffs claim KGDA is so broadly worded that "citizens are left with insufficient notice about what conduct is permitted and what conduct is prohibited" and about "what potential sanctions are attached to that conduct." Doc. 143 at 12.

Defendants argue that Plaintiffs have not included a claim in the Pretrial Order that the policies themselves are unconstitutional—only that the <u>trespass notice</u> is unconstitutional—and therefore the claim is not properly part of this case. Doc. 154 at 11-13; *see also* Doc. 138 at 9. Defendants' point is well-taken. The Pretrial Order does not contain a void-for-vagueness claim as to any USD 287 policies. Plaintiffs suggest that they gave fair notice that the constitutionality of the policies was at issue because an earlier partial summary-judgment motion included that as a possible legal theory. *See* Doc. 156 at 10; *see also* Doc. 113 at 7. But Plaintiffs' argument actually reinforces Defendants' claim of unfair surprise.

In that first partial motion, filed on May 29, 2018, Plaintiffs did list as a possible <u>theory</u> of liability that the policies were unconstitutional. But they then specifically opted not to pursue that theory in the motion, though with the caveat that the theory was not being abandoned.

But when the Pretrial Order was filed on September 21, 2018, some four months later, Plaintiffs omitted that as a theory or claim.[21] Because Plaintiffs did not pursue it in the first motion and then failed to include it in the Pretrial Order, Defendants were justified in assuming that

---

[21] To be clear, the Pretrial Order does challenge the constitutionality of the July 13 exclusion letter. Doc. 138 at 9. But that is a separate question from the constitutionality of the <u>policies</u> based on vagueness. A facial challenge makes "an examination of whether the terms of the [policy] itself measured against the relevant constitutional doctrine, and independent of the constitutionality of particular applications, contain a constitutional infirmity that invalidates the [policy] in its entirety." *Taylor v. Roswell Indep. Sch. Dist.*, 713 F.3d 25, 39 (10th Cir. 2013) (quoting *Doe v. City of Albuquerque*, 667 F.3d 1111, 1127 (10th Cir. 2012)) (alterations in original). Plaintiffs have clearly reserved a challenge to the constitutionality of the July 13 exclusion letter (which is addressed separately in this order); but they have not reserved any claim regarding the constitutionality of the underlying policies.

Plaintiffs no longer intended to pursue a claim that the policies themselves were unconstitutionally vague. Because the Pretrial Order now controls the scope of this case, it controls what legal claims will be allowed. *Koch*, 179 F.R.D. at 596.[22] And this claim is not allowed.

Even if the Court were to consider a vagueness challenge to KGDA—or any of the other policies at issue in this case—Plaintiffs would not prevail. "Under the 'void for vagueness doctrine,' a governmental regulation may be declared void if it fails to give a person adequate warning that his conduct is prohibited or if it fails to set out adequate standards to prevent arbitrary and discriminatory enforcement." *West v. Derby Unified Sch. Dist. No. 260*, 23 F. Supp. 2d 1223, 1235 (D. Kan. 1998); *see also Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972) ("It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined."). The purpose of the doctrine is to allow a person of ordinary intelligence to know what conduct is prohibited so they can act accordingly. *Grayned*, 408 U.S. at 108.

In *Grayned*, a picketer who was charged with violating an anti-noise ordinance challenged it as unconstitutionally vague. The ordinance read, in part: "[N]o person, while on public or private grounds adjacent to any building in which a school or any class thereof is in session, shall willfully make or assist in the making of any noise or diversion which disturbs or tends to disturb the peace or good order of such school session or class thereof. . . ." *Id*. at 107-08. The Supreme Court ruled the ordinance was not vague because "it is clear what the ordinance as a whole prohibits." *Id*. at 110. The Supreme Court further held that "a statute written specifically for the school context, where the prohibited disturbances are easily measured by their impact on the normal activities of

---

[22] Plaintiffs also clarify in their reply that they are not making an overbreadth challenge to USD 287 policies KGD and KGDA. Doc. 156 at 17-18. They do, however, attempt to reserve an overbreadth challenge to the so-called "ad hoc" policy they believe was created in the July 13 exclusion letter. *Id*. But, as with the other facial claims regarding the policies, the Court notes that there is no such claim in the Pretrial Order, and any such claim is therefore waived. Doc. 138 at 9; *Koch*, 179 F.R.D. at 596.

the school" fairly gives notice about what it covers. *Id.* at 112. The degree of discretion left to police officers in enforcing the ordinance was also deemed permissible. *Id.* at 114.

The Supreme Court also rejected the argument that the anti-noise ordinance was unconstitutionally overbroad. In doing so, *Grayned* reiterated the importance of context—namely, the school environment—in evaluating whether the ordinance created an unconstitutionally overbroad regulation. *Id.* at 117-18. Though First Amendment protections still exist in schools, the Supreme Court noted it had never "suggested that students, teachers, or anyone else has an absolute constitutional right to use all parts of a school building or its immediate environs for his unlimited expressive purposes." *Id.* at 117-18 (citing *Tinker v. Des Moines Independ. Cmty. Sch. Dist.*, 393 U.S. 503, 513 (1969)). In other words, even though the ordinance touched expressive conduct, in the context of protecting schools, certain expressive conduct can be prohibited. *Id.* at 120-21.

*Grayned* drives the Court to a similar conclusion here. The challenged policy—KGDA[23]—clearly spells out the conduct that may lead to someone being denied access to a school. Doc. 149-27 at 3 (applying "to persons who have no lawful business to pursue at the school, persons who are acting in a manner disruptive or disturbing to the normal educational functions of the school, or persons who are on school property in violation of Board and/or building policy"). Indeed, KGDA is more specific than the ordinance at issue in *Grayned*, which was found to be neither vague nor overly broad.[24]

---

[23] Plaintiffs do not argue that the other USD 287 policy at issue, KGD, is likewise void for vagueness. Nevertheless, KGD is, if anything, <u>more</u> specific than KGDA, stating, "Persons threatening the safety of students, school personnel or other persons; to damage school property; to interfere with school or school activities or the educational process will be asked to leave the premises." Doc. 149-27 at 2.

[24] Plaintiffs also suggest that KGDA is similar to a criminal statute because violating the policy can eventually lead to criminal trespass penalties. Doc. 143 at 10; Doc. 156 at 14-15. While it is true that KGDA states that those who refuse or fail to leave when asked to do so by an authorized school official "shall be considered to be trespassing in violation of Kansas law" and "police will be contacted," the only action school officials can take under the policy itself is denying access to school grounds. Doc. 149-27 at 3. That does not make a school district policy akin to a criminal statute. Any policy governing behavior could eventually devolve into a police matter. But that does not mean that KGDA itself carries criminal penalties. This matters because courts have drawn such

Given these considerations, the Court is unconvinced that KGDA fails to provide those of ordinary intelligence with enough information to understand what conduct is not permitted on school property. KGDA simply authorizes the superintendent to deny access to "persons who have no lawful business to pursue at the school, persons who are acting in a manner disruptive or disturbing to the normal educational functions of the school, or persons who are on school property in violation of Board and/or building policy." Doc. 149-27 at 3. While the policy leaves room for discretion, that discretion is necessary in the school context, regardless of whether it applies to students or the public. *See Taylor*, 713 F.3d at 50-51. Plaintiffs concede that Defendants can "prohibit a vast array of conduct by the public on school property, but whatever the ultimate amount of conduct that is, it must be set out so that the ordinary person in the public knows what it is." Doc. 156 at 17. But that standard is clearly met, and it is neither constitutionally required nor practical to expect school officials to post an itemized list of situations that disrupt or disturb school functions. Accordingly, Plaintiffs' motion for summary judgment regarding the facial constitutionality of USD 287 policies is denied.

**2.     Defendants have not established an entitlement to complete summary judgment regarding Hirt's First Amendment claim (Counts I and IX).**

Defendants correctly note that Hirt's "First Amended claim is amorphous." Doc. 149 at 10. In the Pretrial Order, Plaintiffs state that the July 13 exclusion letter was "unconstitutional facially and as-applied, concerning . . . right of free speech, right to receive information, and right to assemble." Doc. 138 at 9.[25]

---

distinctions in evaluating different policies, ordinances, and enactments. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) ("The Court has . . . expressed greater tolerance of enactments with civil rather than criminal penalties because the consequences of imprecision are qualitatively less severe."). It also overlooks that KGDA is a <u>school</u> district policy. School officials and school policies necessarily are given more leeway and discretion in managing and overseeing schools. *See Taylor*, 713 F.3d at 50-51.

[25]  While the "right to assemble" may refer to the right "peaceably to assemble" in the First Amendment, it is unclear what Plaintiffs mean by "right to receive information." To the extent Plaintiffs intend this to refer to rights under

In hopes of clarifying, the Court first notes that Plaintiffs are challenging the July 13 exclusion letter as both a retaliatory action by Turner taken in response to speech by Hirt, and as a prior restraint by USD 287 restricting Hirt's future (from the date of the letter) First Amendment activities.[26] *See Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1182 (10th Cir. 2010) ("A prior restraint claim is distinct from a retaliation claim because it is based on a restriction that 'chills potential speech before it happens,' rather than 'an adverse action taken in response to actual speech.'" (quoting *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 492 F.3d 1192, 1209 (10th Cir. 2007)); *Wilson v. N.E. Indep. Sch. Dist.*, 2015 WL 13716013, at *6 (W.D. Tex. Sept. 30, 2015) ("Thus, because the [trespass notice] allowed NEISD officials to grant or deny Wilson permission to participate in the forum, it acted as a prior restraint on her First Amendment freedom of expression."); *see also* Doc. 139 at 8 n.5; Doc. 143 at 17-19. These are distinct claims that carry separate standards. Accordingly, the July 13 exclusion letter is analyzed separately both as a prior restraint by USD 287 on Hirt's activities and under a theory of retaliation by Turner.

---

KORA or KOMA, the Court has previously determined no such rights are affected in this case. *See* supra sections III.A. and III.B. Plaintiffs do not meaningfully respond to Defendants' motion as to any alleged violations regarding the right to assemble, associate, or receive information, other than to say "Defendants appear to acknowledge the analysis would encompass all of those rights noting, buried in citations, that the right of assembly is 'little more than a shorthand phrase used by the Court to protect traditional first amendment rights of speech and petition as exercised by individuals in groups' [citation omitted] and its [sic] has long be [sic] held that the right to receive information is a corollary to the right to exercise free speech." Doc. 155 at 23; *see also* Doc. 149 at 17-20. This is plainly insufficient to defeat summary judgment as to any claims regarding a "right to assemble" or "right to receive information," to the extent Plaintiffs are suggesting that there is something other than the right to free speech at issue.

[26] The Pretrial Order makes it clear that the retaliation claim is only against Turner in his individual capacity. Doc. 138 at 9. Although neither the Pretrial Order nor the Third Amended Complaint make it clear which Defendant is the subject of the prior-restraint claim, the Court concludes it is against USD 287 only. This is because the Pretrial Order does <u>not</u> state that the claim is against Turner in his individual capacity, and because Defendants have conceded that, to the extent the July 13 exclusion letter was a constitutional violation, USD 287 would be liable because it was sent under USD 287's authority. *See* Doc. 149 at 10 (citing *Farnsworth v. City of Mulvane*, 660 F. Supp. 2d 1217, 1228 (D. Kan. 2009) (finding that the city is liable for the mayor's actions when he was acting pursuant to official city policy)); *see also* supra section III.C.

The second point of confusion stems from the parties' disagreement about the scope of Hirt's prior-restraint challenge. There is no dispute that the July 13 exclusion letter banned Hirt from all school property. Doc. 93-1 (banning Hirt from school property "for any reason or under any circumstance" and "at any time hereafter").[27] Defendants frame the First Amendment prior-restraint claim as only involving Hirt's exclusion from school board meetings and argue that Hirt has never challenged the ban as it pertains to sporting events or other school events. Doc. 149 at 10; Doc. 159 at 4-5. By contrast, Plaintiffs' motion claims that the ban is a prior restraint on Hirt attending school sporting events as well as school board meetings. Doc. 155 at 17, 28-30.

In the Pretrial Order, Plaintiffs included no specific forum in their legal contentions, or any specific legal contentions at all. Doc. 138 at 9. Although Plaintiffs did include a factual contention in the Pretrial Order that, but for the ban, Hirt "would have attended sporting events on USD 287 property to which the public is invited . . . and he would have complied with all policies of the school while doing so," Doc. 138 at 6 (¶ 15), that contention does not state that Hirt would have engaged in any protected First Amendment activity. By contrast, the factual contention regarding school board meetings specifically states that "Hirt would have attended school board meetings on USD 287 property and used expressive speech that is protected by the First Amendment during the Patron Forum portion of the meetings . . . ." *Id.* (¶ 14).

Based on this, and mindful of their pro se status, the Court concludes that Plaintiffs have not preserved a First Amendment prior-restraint claim about attending sporting events because there are no contentions that the ban implicated First Amendment concerns as to sporting events. Likewise, the Pretrial Order also includes a factual contention about Hirt being asked to leave an

---

[27]   Although the July 13 exclusion letter was an open-ended ban, Defendants rescinded it after Plaintiffs filed this lawsuit. Doc. 41 at 5.

August 2015 elementary school open house. Doc. 138 at 6. But it does not include a contention that the open house involved any expressive conduct by Hirt. Accordingly, the only prior-restraint claim before the Court that plausibly involved protected First Amendment conduct is Hirt's claim that the July 13 exclusion letter prevented him from attending school board meetings and speaking at the patron forum. Plaintiffs are further cautioned that hints in the briefing that they may later attempt to introduce other forums, *see* Doc. 155 at 17, are not well taken as those claims are also not in the Pretrial Order and have not been preserved.

Evaluating constitutional issues involving private speech on government property is a three-step analysis: (1) determine whether a plaintiff's conduct is protected speech; (2) "identify the nature of the forum, because the extent to which the [defendant] may limit access depends on whether the forum is public or nonpublic"; and (3) determine "whether the justifications for exclusion from the relevant forum satisfy the requisite standard." *Cornelius v. NAACP Legal Def. & Educ. Fund*, 473 U.S. 788, 797 (1985); *see also Summum v. Callaghan*, 130 F.3d 906, 913 (10th Cir. 1997).

As to the first step, although Defendants may dispute whether the July 13 exclusion letter was sent in response to protected conduct, there is no argument that the ban at least prospectively limited some protected conduct of Hirt speaking at school board meetings. Defendants ask for summary judgment because they say Hirt has failed to identify any protected conduct that he <u>was</u> engaged in. But past conduct is more relevant to the retaliation claim. A prior-restraint claim is forward looking. Attending future school board meetings (in relation to the July 13 exclusion letter) and speaking at the patron forum constitute protected conduct or speech. *See Wilson*, 2015 WL 13716013, at *3 ("While the [trespass notice] issued here does not explicitly contemplate restricting Wilson's speech, because it acts to exclude her from school board meetings, it is

effectively a categorical ban on all speech—including speech that would be protected in the context of a school board meeting."); *see also* Doc. 139 at 8 n.5.

The second step—the forum analysis—is necessary because "[t]he existence of a right of access to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44 (1983). The "First Amendment does not guarantee access to property simply because it is owned or controlled by the government." *Id*. at 46 (quoting *United States Postal Serv. v. Greenburgh Civic Ass'n*, 453 U.S. 114, 129 (1981)). The Court has previously concluded that the patron forum at school board meetings is a limited public forum. Doc. 139 at 9-11.

As to the third step, in a limited public forum, the government "may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry Educ. Ass'n*, 460 U.S. at 46; *see also Christian Legal Soc'y Chapter of the Univ. of Cal., Hastings Coll. of Law v. Martinez*, 561 U.S. 661, 679 n. 11 (2010) (stating that in a limited public forum, "a governmental entity may impose restrictions on speech that are reasonable and viewpoint-neutral"); *Farnsworth*, 660 F. Supp. 2d at 1224-25 ("Both the Supreme Court and the Tenth Circuit have applied nonpublic fora standards to 'limited public fora' such that restrictions on speech must be reasonable and viewpoint-neutral.").

In ruling on Plaintiffs' prior partial motion of summary judgment, the Court found that factual disputes precluded it from determining whether (1) the categorical ban against Hirt was viewpoint-based and therefore impermissible, or (2) whether the ban was issued for the purpose of restoring order to school board meetings and thus a reasonable and view-point neutral

restriction. Doc. 139 at 12-13. This was because the parties disputed the characterizations of Hirt's conduct that gave rise to the exclusion. *Id.* at 12.

Defendants attempt to avoid a similar factual dispute by focusing only on the undisputed facts in arguing that Hirt's ban was reasonable: specifically, that Hirt was reprimanded for speaking out of turn at meetings (though the number of times or level of disruption caused is not stated, nor was he ever asked to leave); that he called board members names, including referring to Turner as a "dork" once and board members as "sons of bitches" (the number of times this occurred is again not specified); and that Hirt drove through school parking lots sixteen times for no apparent reason, and twice attempted to enter classrooms but was turned away—incidents that frightened school staff. Doc. 149 at 12-13.[28]

The Court agrees that some of these events were rightfully troubling and concerning to school officials, in particular Hirt's attempts to enter classrooms. Nor does the Court dispute that schools do have a right—and duty in certain cases—to regulate access to their properties. But it does not follow from these undisputed facts that it was therefore reasonable to categorically ban Hirt from all school property at all times, including school board meetings, indefinitely and without limitation, or without alternative means of participation.[29] In other words even if the Court accepts these facts as the reason for the ban, the question still remains whether a categorical ban into perpetuity is a <u>reasonable</u> response to those articulated concerns. Other courts have noted that such categorical bans are typically problematic, despite the deference permitted to schools in regulating their property. *See Taylor*, 713 F.3d at 50-51; *see also Reza v. Pearce*, 806 F.3d 497, 503-05 (9th

---

[28] Although these facts are undisputed, Plaintiffs argue that the only reason for the ban given to the sheriff was that Hirt called board members "sons of bitches," which they argue calls in to question whether these other issues actually motivated the July 13 exclusion letter.

[29] Defendants state that Hirt still had alternative ways to participate in school board meetings. But the July 13 exclusion letter does not explain any of those alternatives if that was the case. Doc. 93-1.

Cir. 2015) (finding that a statehouse hearing was a limited public forum, and a total exclusion in response to a single disruptive act exceeded bounds of reasonableness); *Coffelt v. Omaha Sch. Dist.*, 309 F. Supp. 3d 629, 638, 643 (W.D. Ark. 2018) (noting that "school board meetings, athletic events, pageants, and other community functions" at a school create a "limited/designated public forum," but questioning whether "a sweeping and restrictive" ban was reasonable); *Barna v. Bd. of Sch. Dirs. of the Panther Valley Sch. Dist.*, 143 F. Supp. 3d 205, 213-14, 222-23 (M.D. Pa. 2015), *rev'd on other grounds*, 877 F.3d 136 (3d Cir. 2017) (noting that school board meetings create limited public forums and finding that many cases have concluded that "outright, content neutral bans and prohibitions on speech and attendance that are directed at and prohibit future expressive activity are unlawful"); *see also Warkevicz*, 2016 WL 3753108, at *7 n.80 (noting that courts are more likely to be amenable to limited and targeted bans).

There is certainly little dispute, as Defendants argue, that government agencies, including USD 287, are entitled to conduct orderly and efficient meetings. But the issue presently before the Court at the summary judgment stage is whether, under the facts alleged, every reasonable juror would find the categorical ban on Hirt was a reasonable response to the articulated concerns. Defendants have not persuaded the Court on that point. Accordingly, the Court denies Defendants' summary judgment motion regarding the categorical ban of Hirt from attending school board meetings.

### 3. Factual disputes prevent summary judgment on Hirt's retaliation claim.

Hirt asserts a retaliation claim against Turner. Doc. 138 at 9. Plaintiffs' motion suggests that the reason given by Defendants as to why Hirt was banned from school property was that he had been calling school board members "SOBs" during school board meetings. Doc. 143 at 18. Plaintiffs incorrectly allege this establishes a prima facie case of retaliation for protected speech.

A First Amendment retaliation claim requires that a plaintiff show "that (a) he or she was engaged in constitutionally protected activity; (b) the defendant's actions caused the plaintiff to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity; and (c) the defendant's adverse action was substantially motivated as a response to the plaintiff's exercise of constitutionally protected conduct." *Van Deelen v. Johnson*, 497 F.3d 1151, 1155-56 (10th Cir. 2007); *Worrell v. Henry*, 219 F.3d 1197, 1212 (10th Cir. 2001); *see also McCook*, 44 F. App'x at 903 (stating that the standard in *Worrell* is appropriate in First Amendment retaliation cases where plaintiffs are not employees of defendants and there is no contractual relationship between the two parties).

Defendants argue that Plaintiffs are not entitled to summary judgment on this claim because there is a dispute about whether the adverse action—the July 13 exclusion letter to Hirt—was substantially motivated by Hirt's constitutionally protected conduct. Specifically, the parties dispute why Hirt was banned from school property. Defendants claim it was because of Hirt's increasingly rude and disruptive behavior and comments at school board meetings, his numerous unauthorized trips onto school property that made school staff uncomfortable, and this threatening behavior towards Turner following the June 8, 2015 school board meeting. Doc. 154 at 3; Doc. 149 at 4. Hirt contends that those reasons are a "ruse" and that the reason for the exclusion was that he called board members "SOBs." Doc. 155 at 4-6; Doc. 156 at 2-3. This factual dispute prevents the Court from deciding what motivated the decision to ban Hirt. Given this, along with Defendants' concession that a fact issue remains, the Court denies summary judgment as to the retaliation claim.[30]

---

[30] Although Defendants opposed Plaintiffs' motion on the retaliation claim on the basis that a fact issue remains, in their own motion, Doc. 154 at 23-26, Defendants argue that issuing the July 13 exclusion letter was "reasonable" under the facts, and then ask for summary judgment on the retaliation claim. Doc. 149 at 20-21. Putting aside the confusion this raises, "reasonableness" is not the issue in the retaliation claim—that is the focus of the prior-

### 4. Because the law in this area is not clearly established, Turner is entitled to qualified immunity.

But this does not end the analysis on the retaliation claim against Turner. Even assuming Hirt could make a case against Turner for retaliation, Turner is entitled to qualified immunity for his actions unless the law on this question is clearly established. Qualified immunity is meant to protect public servants—"all but the plainly incompetent or those who knowingly violate the law"—from the burdens of lawsuits. *Lewis v. Tripp*, 604 F.3d 1221, 1225 (10th Cir. 2010) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 806-07 (1982) and quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). Once a defendant asserts qualified immunity, the plaintiff must show that: (1) the defendant's actions violate a constitutional right and (2) the constitutional issue was clearly established at the time of defendant's actions. *Medina v. Cram*, 252 F.3d 1124, 1128 (10th Cir. 2001). To be clearly established, the contours of the right must be sufficiently clear so that the official would know that what he was doing violated the right. *Id*. It is not enough to point to the existence of a right at a high level of generality (e.g. a free-speech right or a due-process right)— the question is whether the <u>specific conduct</u> of the defendant is clearly prohibited. *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011) ("The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."); *Cole v. Buchanan Cty. Sch. Bd.*, 328 F. App'x 204, 208 (4th Cir. 2009) ("The right that an official is alleged to have violated must be 'clearly established' not merely as a general proposition (in the way, say, the right to due process is clearly established) . . . ." (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987))). There

---

restraint analysis. Further, because the third retaliation element is not met, the Court makes no determination about whether Plaintiffs have established the first two elements of a First Amendment retaliation claim.

need not be a case directly on point, but judicial precedent must have "placed the statutory or constitutional question beyond debate."[31] *al-Kidd*, 563 U.S. at 741.

Under these standard, the Court finds that Turner is entitled to qualified immunity because, even assuming his conduct violated a constitutional right, Plaintiffs fail to show that the right was clearly established. Plaintiffs have pointed to no authority that would have put Turner on notice that his specific conduct was violating a clearly established right, arguing only that it is "well established that exercise of speech is a fundamental right and deprivation of fundamental rights requires, at minimum, due process of a post-deprivation opportunity to be heard which entails providing notice of method of appeal and Superintendent Turner never provided such, not then, not even two years later." Doc. 155 at 40-41. But merely asserting the existence of a generic constitutional right is not enough to defeat a claim of qualified immunity. *Cole*, 328 F. App'x at 208.

By contrast, the Court notes that many cases have upheld claims of qualified immunity in similar cases, finding that a school official's decision to bar someone from school property does not implicate such a well-established right to defeat qualified immunity. *Johnson v. Perry*, 859 F.3d 156, 175 (2d Cir. 2017) (granting qualified immunity where plaintiff failed to point to any cases "in which a parent has been held to have a First Amendment right to unlimited access to school property"); *Warkevicz*, 2016 WL 3753108, at *7 ("Defendants are entitled to qualified immunity as to Plaintiff's federal claims, because Defendants would have had no 'fair warning'

---

[31] The Tenth Circuit has cautioned that focusing primarily on the second question (whether the right was clearly established) only is not always wise, because, when "determining whether a constitutional right was violated on the premises alleged, a court might find it necessary to set forth principles which will become the basis for a holding that a right is clearly established. . . . . The law might be deprived of this explanation were a court simply to skip ahead to the [second] question . . . ." *McCook*, 44 F. App'x at 902 (quoting *Saucier v. Kratz*, 533 U.S. 194, 201 (2001)). Here, though, the Court has already determined that a factual dispute prevents deciding whether Plaintiffs' constitutional rights were in fact violated. Thus, the focus of the qualified immunity analysis is on whether the implicated rights were clearly established.

that the allegedly violated rights were 'sufficiently clear,' even supposing such rights existed."). Even to the extent similar cases have rejected qualified immunity, that disparity only underscores the fact that this is far from a settled matter. *See, e.g.*, *Reza*, 806 F.3d at 506 (denying claim of qualified immunity because it could find no cases that would permit a government official "to indefinitely ban an individual from a government building based on a single disruption of a hearing"). Indeed, the Court has found very little consensus on most of the constitutional claims raised in this case.

The most fulsome analysis on this point is *Barna*, which bears some resemblance to this case. There, the plaintiff was banned from attending school board meetings, school extracurricular activities, and from being physically present on school property. *Barna v. Bd. of Sch. Dirs. of Panther Valley Sch. Dist.*, 877 F.3d 136, 140 (3d Cir. 2017). This was in response to several incidents at school board meetings where Barna alluded to the fact that his friends have guns and that he "may have to come after all of yous;" where Barna raised his voice, became confrontational, and challenged the school board president to a fight; and one incident where Barna "uttered '[s]on of a bitch' within earshot of meeting attendees, including some children." *Id.* The school district banned Barna, though he was still permitted to submit written questions to the board. *Id.* at 140-41. The district court had concluded that the categorical ban was unconstitutional under the First Amendment,[32] but nevertheless granted qualified immunity to the defendants "because the right to participate in School Board meetings despite engaging in a pattern of threatening and disruptive behavior was not 'clearly established.'" *Id.* at 141.

---

[32] Although the district court in *Barna* concluded the ban was a constitutional violation, that question was not reached by the Third Circuit because the issue on appeal focused on whether the law was clearly established. *Barna*, 877 F.3d at 141.

The Third Circuit affirmed the grant of qualified immunity as to the individual defendants, finding no persuasive authority that addressed the "removal of a disruptive participant from a limited public forum like a school board meeting." *Id.*at 142-43. The Third Circuit noted that the existence of some contrary authority was not enough "to place the 'statutory or constitutional question beyond debate.'" *Id.* (citing *al-Kidd*, 563 U.S. at 741). The Third Circuit specifically noted that "there does not appear to be any such consensus—much less the robust consensus—that we require to deem the right Barna assets here as clearly established." *Id.* at 144-45 (affirming grant of qualified immunity to individual board members).

The Court agrees with this analysis. Because Plaintiffs fail to show that Turner's conduct violated a "clearly established" right, Turner is entitled to qualified immunity, and he is therefore dismissed from this case.[33]

## IV.    CONCLUSION

Plaintiffs' partial motion for summary judgment is denied as to all arguments raised. Defendants' motion for summary judgment is granted on Plaintiffs' KOMA and KORA claims, as well as to Hirt's purported due-process claim, and Clark's First Amendment claim. Turner is entitled to qualified immunity, and therefore all claims, including Hirt's retaliation claim, against him in his individual capacity are dismissed. Defendants' motion for summary judgment as to Hirt's claim that the July 13 exclusion letter violated his First Amendment rights is denied.

THE COURT THEREFORE ORDERS that Plaintiffs' Second Motion for Partial Summary Judgment (Doc. 142) is DENIED.

---

[33]   As noted above, the only claim against Turner in his individual capacity in the Pretrial Order is the retaliation claim. Doc. 138 at 9. Even if Plaintiffs intended to assert the prior-restraint claim against Turner, this same qualified-immunity analysis would apply, and that claim would be subject to dismissal as to Turner in his individual capacity.

THE COURT FURTHER ORDERS that Defendants' Motion for Summary Judgment (Doc. 147) is GRANTED IN PART AND DENIED IN PART.

THE COURT GRANTS summary judgment to Defendants on Counts II, III, IV, VII, IX, and X.

THE COURT FURTHER GRANTS summary judgment to Turner as to all claims against him in his individual capacity.

THE COURT FURTHER ORDERS that Counts V and XI are dismissed without prejudice for lack of subject-matter jurisdiction.

THE COURT FURTHER ORDERS that Counts VI and VIII were not included in the pretrial order and are therefore deemed waived.

THE COURT FURTHER ORDERS that the only remaining claim in this case is Count I, which reflects Hirt's claim that the July 13 exclusion letter violated Hirt's right to free speech as to school board meetings.

THE COURT FURTHER ORDERS that this matter is set for a telephone status conference on Wednesday, May 22, 2019, at 1 p.m. The parties are instructed to call in on CONFERENCE LINE 1-877-411-9748, and enter ACCESS CODE 6895973.

IT IS SO ORDERED.

DATED: April 24, 2019                    */s/ Holly L. Teeter*
                                          HOLLY L. TEETER
                                          UNITED STATES DISTRICT JUDGE